UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ANNAMARIE MUNN-DEBLOCK,:
                            :CIVIL ACTION NO. 3:17-CV-1420
        Plaintiff,          :
                            :(JUDGE CONABOY)
        v.                  :
                            :
NANCY A. BERRYHILL,         :
Acting Commissioner of      :
Social Security,            :
                            :
        Defendant.          :
                            :
_____

## MEMORANDUM

Pending before the Court is Plaintiff's appeal from the Acting Commissioner's denial of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act") and Supplemental Security Income ("SSI") under Title XVI of the Act. (Doc. 1.) Plaintiff protectively filed applications on April 17, 2014, alleging disability beginning on August 30, 2012. (R. 19.) After Plaintiff appealed the initial August 11, 2014, denial of the claims, a hearing was held by Administrative Law Judge ("ALJ") Daniel Balutis on July 21, 2016. (*Id.*) ALJ Balutis issued his Decision on July 21, 2016, concluding that Plaintiff had not been under a disability, as defined in the Social Security Act ("Act") from August 30, 2012, through the date of the Decision. (R. 29.) Plaintiff requested review of the ALJ's decision which the Appeals Council denied on June 13, 2017. (R. 1-5.) In doing so, the ALJ's decision became the decision of the Acting Commissioner. (R. 1.)

Plaintiff filed this action on August 11, 2017. (Doc. 1.) She asserts in her supporting brief that the Acting Commissioner's determination should be reversed for the following reasons: 1) the ALJ erred in rejecting Plaintiff's treating physician's opinion; and 2) the ALJ's residual functional capacity ("RFC") finding did not incorporate all of the limitations attributable to Plaintiff's anxiety and panic disorder. (Doc. 15 at 3.) For the reasons discussed below, the Court concludes Plaintiff's appeal is properly granted.

## I. Background

Plaintiff was born on January 13, 1967, and was forty-five years old on the alleged disability onset date. (R. 26.) She has a high school education and past relevant work as a unit clerk. (*Id.*) Plaintiff alleged that her inability to work was limited by anxiety, chronic pain, osteoarthritis, migraine headaches, Raynaud syndrome, panic disorder, spinal stenosis, ankylosing spondylitis, shortness of breath, and angina. (R. 197.)

### A. *Medical Evidence*

Plaintiff saw her primary care physician, Lisa Pathak, M.D., on her alleged disability onset date of August 30, 2012, at which time Plaintiff reported that her back was worse but the neurosurgeon did not think it was bad enough for surgery, and her podiatrist was going to do surgery for toe problems. (R. 336.) Plaintiff told Dr. Pathak that she did not feel she could work

because she was in constant pain and under constant stress. (*Id.*)
Dr. Pathak noted that a bone scan showed "abnormal finding mid
thoracic spine diffusely and increased activity in right toe."
(*Id.*) General examination showed the following: Plaintiff was
tearful and very anxious; she had right scapular, under right
shoulder pain with light palpation and minimal to moderate thoracic
pain to touch; she was sad and tearful, anxious and upset. (*Id.*)
Dr. Pathak assessed thoracic spondylosis without myelopathy;
cervical disc herniation with myelopathy; anxiety state,
unspecified; and chronic pain syndrome. (*Id.*) Dr. Pathak noted
that Plaintiff declined Clavil for the cervical disc herniation
because of the possible side effect of weight gain and she would
pursue recommended pain management. (*Id.*) Dr. Pathak recorded
that she wrote a note for short-term disability so that Plaintiff
could get her foot surgery and get pain management under control.
(R. 337.)

Plaintiff sought an extension of her disability at her October
4, 2012, visit with Dr. Pathak because she had not yet seen a pain
management specialist. (R. 362.) Dr. Pathak again saw Plaintiff
on October 18, 2012, at which time Plaintiff reported that the
specialist associated the pain she was experiencing with years of
poor posture, she had another MRI on October 17th, and she had
repeat appointments later in the month with Dr. Rohan, an
orthopedist, and Dr. Castro, her pain management specialist. (R.

3

369.)  Physical examination revealed no abnormalities.  (*Id.*)

Plaintiff saw Ajay Kumar, M.D., of the Pain and Neuropathy Center of PA on November 16, 2012, for evaluation of pain in the right thoracic area, pain in the right arm, and tingling and numbness in the toes of the lower extremities.  (R. 441.)  He noted by history that Plaintiff's MRI showed disc herniations at several levels of the thoracic spine.  (*Id.*) Sensory examination to light touch and pinprick showed significant feeling of paresthesia in the right forearm and feeling of paresthesia in bilateral dorsum of the feet and the toes.  (R. 442.)  Examination of the right upper extremity showed positive Adson test, tenderness along the periscapular area, and range of motion of the right shoulder of 0-130 degrees, minimally painful.  (*Id.*)  Dr. Kumar also found minimal tenderness of the lumbar spine and negative straight leg raise bilaterally.  (*Id.*)  He planned to do NCV/EMG of the lower extremities, MRI of the right brachial plexus, and x-ray of the cervical spine.  (R. 443.)  On December 7, 2012, Dr. Kumar explained that the pain was most likely coming from the spine and he planned to request authorization for a thoracic epidural steroid injection to help her pain.  (R. 440.)  He also noted "[t]he patient is temporary [sic] disabled at this point."  (*Id.*)

Dr. Pathak's December 19, 2012, office visit records indicate Plaintiff again sought extension of her disability.  (R. 371.)  As of that time, Plaintiff reported that she had seen Dr. Kumar who

4

was trying to determine the cause of her pain and he planned to do thoracic injections at the end of the month. (*Id.*) Plaintiff claimed continuing intense pain under her right scapula and right arm movement caused severe burning wrap-around pain. (*Id.*) Plaintiff also reported stress due to her financial situation. (*Id.*) General examination showed that Plaintiff appeared uncomfortable, she had obvious pain on palpation just inferior to right scapula with surrounding spasming, any movement of her right arm caused complaint of burning pain to the right nipple, Plaintiff was unable to rotate the right shoulder, and mental status exam was normal except Plaintiff was tearful at times. (*Id.*)

Dr. Kumar administered the steroid injection on January 5, 2013, without complications or side effects. (R. 437.) At her January 18th visit with Dr. Kumar, Plaintiff reported modest relief from the injection but said she was still in constant pain. (R. 435.) He planned to do another injection at a different level to see if it would better help Plaintiff's pain. (R. 436.) He again noted that Plaintiff was temporarily disabled. (*Id.*) Plaintiff had the injection on February 2, 2013, without complications or side effects. (R. 434.) She reported further improvement on February 8th and received another injection on February 16th. (R. 430, 432.) She reported added improvement but said she still had pain which she rated at six out of ten. (R. 428.) Dr. Kumar noted that Plaintiff remained temporarily disabled and he would follow up

with her in six weeks.  (R. 429.)

Plaintiff presented at Dr. Pathak's office for an update on disability on February 18, 2013.  (R. 375.)  After reporting that Dr. Kumar had done three more injections on her thoracic spine, Dr. Pathak recorded that Plaintiff

> states that her job was posted and she now no longer has a job to go back to.  States she is very upset about it but Dr. Kumar continued to say she was not able to go back yet and she has been listening to his request.  She has a person who is in HR that is helping her to find a new job in the hospital with a new superior.  States that in order to get this to work out correctly she needs to be cleared to go back to work by 3/11/13 so that way she can get unemployment with disability benefits for 6 months.  States that if a job does not show up she wants to consider going back to school.  States that she is slowly feeling better from the injections and her range of motion is getting a lot better.  States if she keeps getting the injections with Dr. Kumar she feels she will be getting much better and be able to get back to her regular life.

(R. 375.)  Physical examination showed tenderness to palpation in the right thoracic region and decreased range of motion of the right shoulder on abduction and internal and external rotation. (*Id.*)

At her March 26, 2013, office visit with Dr. Pathak, Plaintiff again presented for an update on disability, stating that she needed additional records.  (R. 381.)  Plaintiff reported that her depression had been well controlled with Wellbutrin and she stated that mainly her depression and anxiety was situational related to

6

financial issues while on disability.  (*Id.*)  Physical examination findings were not remarkable.  (*Id.*)

At her April 5, 2013, visit with Dr. Kumar, Plaintiff reported that the pain had become more intense and she had a new onset of muscle spasms and pain in the shoulder blade area.  (R. 425.) Examination showed tenderness along the periscapular area, right shoulder range of motion of 0 to 30 degrees minimally painful, restricted range of motion of the cervical spine, multiple trigger points in the right levator scapulae, rhomboid and trapezius muscles, and moderate tenderness in the thoracic paraspila area. (R. 426.)  Dr. Kumar administered trigger point injections.  (*Id.*) Though Plaintiff experienced some improvement, she reported 6-7 out of 10 pain on June 7, 2013, at which time her physical examination was basically the same as in April.  (R. 424.)  Dr. Kumar advised Plaintiff to continue with home stretching and strengthening program and he would reevaluate her in four to six weeks.  (*Id.*) Plaintiff returned to Dr. Kumar on July 5, 2013, and requested injections to help the pain.  (R. 421.)  He indicated that the injections would be scheduled and Plaintiff was to take Advil and Motrin on an as-needed basis to help with her pain.  (R. 422.)

In May 2013, Plaintiff told Dr. Pathak that she hoped to stay on disability through "the end of the summer to be able to get a couple more injections with Dr. Kumar since they really help."  (R. 385.)  Dr. Pathak noted that Plaintiff's thoracic spondylosis was

stable, Plaintiff was still on disability due to pain and weakness in her right upper extremity, and she would continue to get injections from pain management. (*Id.*)

Plaintiff was again seen by Dr. Kumar on July 12, 2013, for an emergency visit after she fell at a store and experienced "excruciating" pain (9 out of 10) on the top of the shoulder. (R. 419.) Plaintiff reported difficulty moving the shoulder up and significant worsening of the mid-back pain with radicular symptoms, and off and on tingling and numbness in the right arm. (*Id.*) Dr. Kumar noted that Plaintiff had an x-ray of the shoulder which showed probability of a joint injury. (*Id.*) Dr. Kumar advised Plaintiff to follow up with an orthopedic surgeon and noted that further studies may be warranted if her symptoms did not improve. (R. 420.)

At her next visit on August 2, 2013, Dr. Kumar noted that the x-ray of the right shoulder did not show any evidence of significant AC joint injury. (R. 417.) Plaintiff reported improved symptoms but she still had pain in the right shoulder, pain in the mid-back was doing down to the chest wall, and pain, tingling and numbenss in the right arm. (*Id.*) She rated her pain as 8-9 out of 10. (*Id.*) Due to persistent radicular symptoms and worsening pain, Dr. Kumar recommended another MRI and NCV/EMG study. (R. 418.) He also recommended physical therapy three times a week for four weeks and follow up with an orthopedic surgeon.

(*Id.*)  Plaintiff told Dr. Kumar that her insurance would not cover an orthopedic surgeon and she did not know if she could afford it. (*Id.*)  He planned to see Plaintiff back in a month.  (*Id.*)

On August 15, 2013, Plaintiff reported to Dr. Pathak that she was losing her insurance at the end of the month, she was getting injections for her back pain "after the slip and fall that happened at Weiss," and she was getting pain in her back again which affected her breathing, and she was very financially stressed.  (R. 552.)  Physical examination was not remarkable; mental status findings included the notation that Plaintiff was crying and very emotional.  (*Id.*)

On August 30, 2013, Dr. Kumar reported that Plaintiff's mid-back pain had improved about 50-60% after the last epidural steroid injection and she was not getting any radicular symptoms down the chest wall but she was complaining of more pain in the right shoulder blade area.  (R. 414.)  Dr. Kumar administered trigger point injections, recommended continuation of home exercise program, and planned to see Plaintiff again in two months.  (R. 415-16.)

In October 2013, Plaintiff reported to Dr. Pathak that she was not able to work due to severe anxiety and depression and she needed a form for short-term disability which would last until February or March of 2014.  (R. 547.)  Other than a notation that Plaintiff was "crying and sad" general examination findings were

normal. (*Id.*) Disability was again discussed in December 2013 when Plaintiff said she was unable to work because of severe anxiety, including panic attacks. (R. 556.) Plaintiff reported she was taking Percocet as needed for severe back pain and she could not afford to see Dr. Kumar. (*Id.*) General examination findings indicated no problems. (*Id.*)

In February 2014, Plaintiff told Dr. Pathak that she was still very stressed out and "would like to see Kr. Kumar again because her back was hurting again." (R. 554.) Dr. Pathak recorded that Plaintiff said her son was having problems with being home schooled and pornography was found on his computer, she lost her unemployment, she started getting stabbing pains in the left hip where she gets ankylosing spondylitis. (*Id.*) General examination findings did not indicate any problems. (*Id.*) Dr. Pathak gave Plaintiff a prescription for physical therapy and referred her to Dr. Kumar for further injections. (R. 555.)

At her May 6, 2014, visit with Dr. Pathak, Plaintiff reported numerous problems. (R. 563.) Dr. Pathak recorded that Plaintiff's son ran away from home but was found, her husband lost his job and had been drinking, Plaintiff was crying and close to having a nervous breakdown, her hip was very painful and prevented her from sitting for a long time, her calf was aching, her hands were "locking up" and she had no strength, she was having memory loss and trouble concentrating, and she was having problems with

insomnia.  (R. 563.)  General examination showed that Plaintiff was crying, upset, and shaking, and her affect was sad, but she had good eye contact and normal speech, and she was oriented times three.  (R. 565.)  Extremity and musculoskeletal examination showed no problems.  (*Id.*)

In June 2014, Plaintiff reported to Dr. Pathak that her son and husband were both working and she was doing better, she did not want to take the increased medication dosage suggested by the psychiatrist she had seen, and she continued to complain of leg pain.  (R. 575.)  General examination showed some point tenderness in her back and radiation of pain down her leg.  (*Id.*)  Dr. Pathak assessed spinal stenosis of the thoracic region, with sciatica noted to be her working diagnosis.  (*Id.*)

On July 8, 2014, Plaintiff was seen at Dr. Pathak's office for what she believed was a spider bite on her neck.  (R. 579.)  Other than neck problems, no problems were noted on general examination. (*Id.*)  On July 16, 2014, Plaintiff was seen for worsening pain from the bite.  (R. 581.)  Other than neck problems, the provider did not report any problems on general examination.  (*Id.*)  Dr. Pathak diagnosed cellutis and absess of the neck and planned to get an MRI.  (R. 582.)

Plaintiff had her first of three visits with neurologist Kenneth W. Lilik, M.D., on February 18, 2015, on Dr. Pathak's referral for complaints of leg and lower back pain.  (R. 915.)  Dr.

Lilik noted that Plaintiff had the onset of sharp pain in her left calf in March 2014 and she developed left hip pain in July 2014 that had been intermittently uncomfortable. (*Id.*) He also noted that an August 2013 MRI showed thoracic disc herniation between T6-7, T7-8 and T9-10 and an a June 2014 MRI scan of the left hip showed no pathologic abnormalities. (*Id.*) Physical examination indicated straight leg raising caused pain at ninety degrees, left hip pain upon rotation of the hip, moderately decreased toe tapping on the left and normal on the right, difficulty walking on toes of left foot but able to walk on heels of both feet, and sensory exam normal to light touch. (R. 916.) Dr. Lilik noted that the EMG and nerve conduction study done by him on the same date indicated old or chronic mild bilateral L4 and left L5 radiculopathies and suspected left L1 radiculopathy. (*Id.*) His diagnostic impression included the EMG and nerve conduction study findings, multiple thoracic disc herniations, migraine, left hip pain, depression, and history of ankylosing spondylitis. (R. 916-17.)

On March 6, 2015, Plaintiff saw Shalini Byadgi, M.D., to establish care. (R. 589.) Records indicate that Plaintiff presented with a history of GERD and back pain, she had the pain for twelve years but it got worse when she fell on July 8, 2014, she had been seen by Dr. Dholoki, a Lords Valley psychiatrist, who presribed Wellbutrin and Xanax, she took Flexeril as needed for spasm but she took it rarely, she rarely took Percocet, physical

therapy did not help at all, and she had constipation for which she was doing all that she was told to do and was frustrated that she still had some issues. (*Id.*) Physical examination showed mild lumbar tenderness, no obvious joint deformity, and normal gait. (R. 591.) Psychiatric exam showed that Plaintiff was anxious and tearful. (*Id.*) No other problems were indicated.

On April 22, 2015, Dr. Lilik saw Plaintiff and sent a report to her new primary care provider, Dr. Byadgi. (R. 906.) He reported that a March 6, 2015, MRI indicated a diffuse bulge at L4-5 with a left central disc protrusion and mild central canal stenosis along with left foraminal stenosis. (R. 906.) He noted that Plaintiff had no severe spontaneous headaches since her February visit when her medication dosage was increased, she had developed paresthesias in the fingers and toes, and she had longstanding cervical and shoulder pain. (*Id.*) Examination findings included no tenderness or anomalies of the spine or extremities, deep tendon reflexes were mildly decreased at the quadriceps, absent at the right Achilles tendon and mildly decreased on the left, and she had difficulty walking on her left toe and heel due to weakness. (R. 907.) Dr. Lilik suggested that Plaintiff's diverticulitis be addressed because it was hard to differentiate whether she was getting progression or improvement of her low back discomfort when she has exacerbation of the low back associated with her abdominal problems, she should have a

neurosurgical consult because of left lower extremity weakness, and she should have an EMG and nerve conduction study of the right upper extremity to determine whether she had cervical radiculopathy. (*Id.*)

On August 21, 2015, Dr. Lilik saw Plaintiff for right elbow pain, tightness on the right side of her neck, and heaviness in her right shoulder. (R. 898.) He noted that she struck her right elbow and shoulder in a July 2013 fall and had intermitted elbow pain since then. (*Id.*) He recorded that Plaintiff had heaviness when raising her right arm, she had intermittent numbness of the right thumb, index and middle fingers, and she had difficulty opening tight bottles. (*Id.*) Following a nerve conduction study and motor unit examination, Dr. Lilik's impression was borderline right ulnar neuropathy at the elbow, suspected mild right C6 or C7 radiculopathy, and motor unit loss in the right abductor pollicis brevis muscle without a current median neuropathy at the wrist. (*Id.*) In his report to Dr. Byadgi, Dr. Lilik reported that Plaintiff felt the Topiramate she was taking for low back pain extending down her legs had reduced her radicular discomfort. (R. 903.) He added that she had no side effects of the medication, standing for five minutes was about as much as she could do, and she had not had any migraines since starting the Topiramate (which he had increased in Feburary 2015), but she was having tension headaches. (*Id.*) Dr. Lilik confirmed that Plaintiff had

14

degenerative disease of the spine as well as anxiety and depression. (*Id.*) Physical examination showed mild weakness of the right abductor pollicis brevis and mild pain upon palpation of the right ulnar nerve at the elbow. (R. 904.) Dr. Lilik suggested that Plaintiff avoid leaning on her right elbow, an elbow pad may be helpful, and she should return to see him in nine months. (R. 904-05.)

On August 28, 2015, Dr. Byadgi saw Plaintiff for follow up. (R. 601.) He noted that since her previous visit Plaintiff had seen a cardiologist, pulmonologist, and GI specialist. (*Id.*) Review of Systems indicated that Plaintiff reported intermittent abdominal pain with constipation and she had no other complaints. (R. 603-04.) Physical examination showed mild abdominal tenderness and no other problems were recorded. (R. 604.)

On September 25, 2015, Plaintiff saw Dr. Biadgi because she had injured her leg. (R. 612.) Other than the wound on her leg, Reveiw of Systems was negative and physical examination showed no problems, including no abdominal or lumbar tenderness. (R. 614-15.) Other than sinus problems, no problems were noted on examination when Plaintiff saw Dr. Biadgi in December 2015. (R. 631.)

Dr. Biadgi's office visit records for 2016 are similar to 2015 records. Plaintiff presented for sinus problems on January 19, 2016, Review of Systems at the time was otherwise negative, and

general examination revealed sinus related problems but no other problems. (R. 698, 700.) Plaintiff presented with a rash around her mouth on February 25, 2016, and Review of Systems was again negative. (R. 708, 710.) Physical examination findings did not indicate any problems other than "some maculopapular lesions around mouth." (R. 710.) On April 5, 2016, Plaintiff presented with hand pain in a follow up from the emergency room, an eye problem, and flank pain. (R. 718.) Review of Systems indicated intermittent back pain, intermittent headaches, and arthralgias or arthritis. (R. 720.) Examination showed eye problems, mild lumbar tenderness, and normal gait. (R. 720-21.) Dr. Biadgi reviewed Plaintiff's problems and noted the following under "Assessment/Plan": regarding chronic pain, Plaintiff "only takes occasional refill"; regarding chronic fatigue, future testing was planned; regarding migraine, they had been stable after her medication dosage was adjusted by her neurologist in the past; and regarding anxiety, Plaintiff "occasionally takes, needs refill once in 6 months." (R. 721.)

On May 27, 2016, Plaintiff was seen by Daniel Terpstra, D.O., at Coordinated Health with the chief complaint of left shoulder and hand pain subsequent to a fall which occurred several weeks earlier. (R. 932-34.) Review of Systems indicated general weakness and fatigue, joint pain and swelling, muscle pain and trouble walking, frequent headaches, chest pain and shortness of breath, and problems with light household chores and climbing

16

stairs.  (R. 932.)  Shoulder exam showed no tenderness, full range of motion and strength, pain with flexion, and mild impingement. (R. 934.)  Plaintiff received an injection of the left subacromial bursa to address mild rotator cuff tendonitis.  (*Id.*)  Plaintiff was referred to John Hernandez, M.D., for treatment of her left hand.  (Id.)  Dr. Hernandez saw Plaintiff on June 13, 2016.  (R. 930.)  He administered an injection to address the hand pain and finger sprain.  (R. 931.)

Plaintiff also saw Kristopher Korsakoff, M.D., approximately nine times from December 2014 to March 2016 for treatment of constipation and colon polyps.  (R. 819-74.)  Physical examinations performed at the office visits routinely indicated no neck problems, no tenderness or other musculoskeletal problems, and normal mood and affect.  (R. 822, 829-30, 833-34, 838-39, 848, 852, 857, 864-65, 869-70.)

## B.  *Mental Health Treatment Evidence*

On June 10, 2014, Plaintiff was evaluated at Wayne Memorial Health Centers Behavioral Health Center upon referral of Dr. Pathak.  (R. 571-74.)  Rashesh Dholakia, M.D., conducted the Adult Initial Psychiatric Evaluation for medication management.  (*Id.*) Plaintiff reported a severely depressed mood (6/10), severe panic symptoms about two to four times a month for the past two to three years, and 6/10 anxiety symptoms.  (R. 571.)  Plaintiff said she had been taking Wellbutrin since 2011 and she had also been

17

prescribed Xanax which she did not take regularly "due to its addictive properties." (R. 572.) Mental status exam showed psychomotor retardation, depressed mood, labile affect, linear and logical thought process, poor self esteem, slightly impaired concentration, fair impulse control, fair insight and judgment, fair reliability, and average to above average intelligence. (R. 573.) Dr. Dholakia assessed the following: major depressive disorder, recurrent, moderate without psychotic features; dysthymia; generalized anxiety disorder; and a GAF of 50-55. (R. 573.) Dr. Dholakia recommended adjusting Plaintiff's medication regimen, including taking Xanax on a regular basis, and he stressed the importance of psychotherapy. (R. 573.) Plaintiff was to return to the clinic in four weeks. (*Id.*)

Records indicate that Plaintiff was seen on November 5, 2014, at which time Dr. Dholakia noted a hiatus of almost five months. (R. 892.) Plaintiff reported decreased reaction time when taking Xanax and she avoided taking it when having to drive or needing full mental alertness. (*Id.*) She denied other medication side effects. (*Id.*) Mental status exam showed decreased psychomotor activity, depressed mood, labile affect, linear and logical thought process, poor self esteem, impaired concentration, fair impulse control, good insight and judgment, good reliability, and average to above average intelligence. (*Id.*) Dr. Dholakia again stressed the importance of psychotherapy which Plaintiff had not yet begun

18

though she had planned to see Ms. Kathleen Dodson.  (R. 893.)
December 15, 2014, Mental status exam was the same (R. 890), and
she showed improved mood/affect and concentration on January 28,
2015 (R. 888).

Dr. Dholakia advised continued regular therapy with Ms. Dodson
and return to the clinic in two months.  (R. 889.)  Improved
mood/affect and attention/concentration were again in April 2015.
(R. 886.)  In July Plaintiff reported more severe and frequent
anxiety and panic attacks related to increased stressors.  (R.
884.)  Mental status exam indicated that her mood was anxious,
attention/concentration were fair, impulsivity/distractibility were
fair, and insight/judgment were good.  (*Id.*)  On August 26, 2015,
Plaintiff reported improved anxiety with medication change but
increased depression due to ongoing family and medical issues.  (R.
881.)  Mental status was similar to that assess in July except that
Plaintiff's insight and judgment were found to be fair.  (*Id.*)  Dr.
Dholakia made similar findings in December and again stressed the
importance of psychotherapy but noted that Plaintiff was "reluctant
at this time."  (R. 879-80.)

On February 23, 2016, Plaintiff discussed ongoing severe panic
attacks occurring on a regular basis and numerous psychosocial
issues.  (R. 877.)  Mental status exam was basically unchanged from
previous visit.  (*Id.*)  Dr. Dholakia switched Plaintiff from Xanax
to Klonopin to address anxiety and panic attacks.  (R. 878.)  He

also discussed other treatment options for management of anxiety but Plaintiff was "not willing at this time." (*Id.*) Plaintiff also refused to pursue the recommended psychotherapy. (*Id.*) In May, Plaintiff again reported increased anxiety and panic attacks related to family problems. (R. 875.) Dr. Dholaki adjusted Plaintiff's medication regimen and noted she again refused optional medications due to potential side effects of antidepressants. (R. 876.) He noted that Plaintiff planned to pursue family therapy. (*Id.*)

## C. *Opinion Evidence*

### 1. <u>Treating Physician Opinion</u>

On February 25, 2015, Lisa Pathak, M.D., completed a Physical Medical Source Statement of Functional Abilities and Limitations. (R. 584-88.) Dr. Pathak noted she had been Plaintiff's primary care provider for roughly ten years. (R. 584.) She listed the following diagnoses: L4-5, S1 radiculopathy; ankylosing sondylitis; right thoracic spondylitis/myelopathy; anxiety/stress/panic disorder; migraine; and diverticulitis. (*Id.*) Dr. Pathak indicated Plaintiff's symptoms were chronic pain, sciatica, panic disorder, and chronic anxiety, and the symptoms were constant. (R. 584, 586.) She elaborated that Plaintiff had pain in her thoracic, lumbar, cervical areas, and left leg pain from sciatica. (R. 584.) Pain was rated at 5-9/10 depending on activity, cold weather made the pain worse, and overexertion made the pain worse. (*Id.*) Dr.

Pathak pointed to the clinical findings and objective signs found in Dr. Lilick's consultation/EMG/conduction and previous MRIs from Newtown Medical Center and Bon Secours Health Center. (R. 585.) Dr. Pathak identified Plaintiff's treatments and medications as follows: Percocet which caused dizziness, drowsiness, and nausea; Flexeril which caused dizziness and drowsiness; thoracic injections; Wellbutrin; and Xanax which caused grogginess and tiredness. (*Id.*) She opined that Plaintiff's impairments had lasted or were expected to last at least twelve months; Plaintiff's depression and anxiety affected her physical condition; and her ability to deal with work stress was severely limited (R. 585-86.) Dr. Pathak further opined that Plaintiff could walk two blocks without rest; she could sit or stand for five minutes at one time and in an eight-hour day she could sit for less than two hours and stand/walk for less than two hours total; she needed a job which allowed her to change positions at will; she would sometimes need to take unscheduled breaks multiple times during the day for anywhere from one-half hour to three hours; her legs should be elevated; she could never lift any weight or use her hands, fingers, or arms; Plaintiff's impairments would cause good days and bad days; and she would likely miss work more than three times a month. (R. 586-87.)

## 2.   State Agency Opinion

On August 11, 2014, Melissa Diorio, Psy.D., a State agency reviewing psychologist concluded that Plaintiff had mild

restrictions of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation, each of extended duration. (R. 130.)

## C. *Hearing Testimony*

At the June 15, 2016, hearing before ALJ Balutis, Plaintiff testified to extensive limitations related to her physical and mental impairments. She said she could not walk for five minutes due to hip pain, back pain and shortness of breath, she could stand for five minutes then had to sit down because of hip and back pain, and she could sit for five to ten minutes due to left hip pain and leg numbness. (R. 58-62.) Plaintiff testified she could comfortably lift two to four pounds and five pounds would present a problem because of pain in her upper and lower back. (R. 63.) Regarding use of her hands, Plaintiff said she had problems with both hands and she sometimes dropped things. (R. 63-64.) Plaintiff said she was completely unable to bend, stoop, or squat, and she could walk up stairs with difficulty. (R. 65.) She testified that she had increased symptoms of shortness of breath as well as hip and back difficulties. (R. 66.) Plaintiff also described very limited daily activities: she read and watched TV but did no regular household chores except occasional dusting and she did no yard work. (R. 69-74.) Plaintiff identified medication side effects including memory loss, abdominal issues, slurred

speech, excessive fatigue, and dry mouth.  (R. 77-79.)

When the ALJ asked about February 2013 office notes from Dr. Pathak which related to Plaintiff finding a new job at the hospital where she had worked and the need to be cleared to go back to work by March 11, 2013, Plaintiff testified that she did not remember about it.  (R. 79.)  However, when asked whether there was any time since August of 2012 that she felt it would be okay to go back to work, Plaintiff said she wanted to try but could not find anything she thought she could do.  (R. 79-80.)  By way of example, she said she thought about going back to deli work that she had done years before but she did not think she could stand long enough because of sciatica.  (R. 80.)  The ALJ also asked about notes indicating Plaintiff was considering going back to school for medical administration and Plaintiff responded that she would have tried that but did not because she did not have a vehicle.  (*Id.*)  ALJ Balutis also asked Plaintiff about seeing a therapist and Plaintiff said she had seen Ms. Dodson about six times and stopped for no particular reason.  (R. 81-82.)

D.    **ALJ Decision**

In his July 21, 2016, Decision, ALJ Balutis found that Plaintiff had the following severe impairments: Raynaud's syndrome; panic disorder; generalized anxiety disorder; major depressive disorder; thoracic spondylosis; migraines; gastric ulcer; gastroesphageal reflux disease (GERD); chronic pain syndrome;

osteoarthritis; mild sigmoid diverticulosis; right shoulder joint injury; tendonitis of left shoulder; chronic lung disease; borderline right ulnar neuropathy at the elbow; and lumbar spondylosis and radiculopathy. (R. 21.) The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment. (R. 22.)

ALJ Balutis assessed Plaintiff to have the residual functional capacity ("RFC")

> to perform light work . . . except she is limited to frequent overhead reaching on the right; she is limited to frequent handling and fingering on the right; she can tolerate frequent exposure to dust, odors, fumes, or pulmonary irritants; she is limited to performing simple, routine tasks; she can have frequent contact with supervisors, coworkers, and the public; her time off task could be accommodated by normal breaks.

(R. 24.) With this RFC, the ALJ concluded Plaintiff was unable to perform her past relevant work but jobs existed in significant numbers in the national economy which she could perform. (R. 28.) On this basis, ALJ Balutis determined that Plaintiff had not been under a disability as defined in the Act from August 30, 2012, through the date of the decision. (R. 29.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[1] It is necessary for the

---

[1] "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically

Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work. 20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record. 20 C.F.R. § 404.1520(e); 416.920(e).

---

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process. *Id.*

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that jobs existed in significant numbers in the national economy which Plaintiff could perform. (R. 28.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision. 42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a
> talismanic or self-executing formula for
> adjudication; rather, our decisions make
> clear that determination of the existence *vel*
> *non* of substantial evidence is *not* merely a
> quantitative exercise.  A single piece of
> evidence will not satisfy the substantiality
> test if the Secretary ignores, or fails to
> resolve, a conflict created by countervailing
> evidence.  Nor is evidence substantial if it
> is overwhelmed by other evidence--
> particularly certain types of evidence (e.g.,
> that offered by treating physicians)--or if
> it really constitutes not evidence but mere
> conclusion.  *See* [*Cotter*, 642 F.2d] at 706
> ("'Substantial evidence' can only be
> considered as supporting evidence in
> relationship to all the other evidence in the
> record.") (footnote omitted).  The search for
> substantial evidence is thus a qualitative
> exercise without which our review of social
> security disability cases ceases to be merely
> deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the ALJ to analyze all probative evidence and set out the reasons for his decision.  *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d Cir. 2000) (citations omitted).  If he has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result

27

but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where a claimed error would not affect the outcome of a case, remand is not required. *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005).  Finally, an ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or

her decision.  *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

As set out above, Plaintiff asserts the Acting Commissioner's determination should be reversed for the following reasons: 1) the ALJ erred in rejecting Plaintiff's treating physician's opinion; and 2) the ALJ's residual functional capacity ("RFC") finding did not incorporate all of the limitations attributable to Plaintiff's anxiety and panic disorder.  (Doc. 15 at 3.)

### A.   *Treating Physician Opinion*

Plaintiff first asserts that the ALJ erred in rejecting the opinion of Plaintiff's treating physician.  (Doc. 15 at 5.) Defendant responds that substantial evidence supports the ALJ's treatment of Dr. Pathak's opinion.  (Doc. 16 at 7.)  The Court concludes this claimed error is cause for remand.

Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight.[2]  *See*, *e.g.*,

---

[2] For claims filed after March 27, 2017, the regulations have eliminated the treating source rule and in doing so have recognized that courts reviewing claims have "focused more on whether we sufficiently articulated the weight we gave treating source opinions, rather than on whether substantial evidence supports our decision."  82 FR 5844-01, 2017 WL 168819, *at 5853 (Jan. 18, 2017).  The agency further stated that in its experience in adjudicating claims using the treating source rule since 1991, the two most important factors for determining persuasiveness are consistency and supportability, which is the foundation of the new regulations.  *Id.*  Therefore, the new regulations contain no automatic hierarchy for treating sources, examining sources, or reviewing sources, but instead, focus on the analysis of these

*Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20
C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d
Cir. 1981)). Sometimes called the "treating physician rule," the
principle is codified at 20 C.F.R. 404.1527(c)(2), and is widely
accepted in the Third Circuit. *Mason v. Shalala*, 994 F.2d 1058 (3d
Cir. 1993); *see also Dorf v. Brown*, 794 F.2d 896 (3d Cir. 1986).
The regulation addresses the weight to be given a treating source's
opinion: "If we find that a treating source's opinion on the
issue(s) of the nature and severity of your impairment(s) is well-
supported by medically acceptable clinical and laboratory
diagnostic techniques and is not inconsistent with the other
substantial evidence in your case, we will give it controlling
weight." 20 C.F.R. § 404.1527(c)(2).[3] "A cardinal principle

factors. *Id.*

[3] 20 C.F.R. § 404.1527(c)(2) states in relevant part:

> Generally, we give more weight to opinions from
> your treating sources, since these sources are
> likely to be the medical professionals most
> able to provide a detailed, longitudinal
> picture of your medical impairment(s) and may
> bring a unique perspective to the medical
> evidence that cannot be obtained from the
> objective medical findings alone or from
> reports of individual examinations, such as
> consultative examinations or brief
> hospitalizations. If we find that a treating
> source's opinion on the issue(s) of the nature
> and severity of your impairment(s) is well-
> supported by medically acceptable clinical and
> laboratory diagnostic techniques and is not
> inconsistent with the other substantial
> evidence in your case record, we will give it

guiding disability eligibility determinations is that the ALJ

accord treating physicians' reports great weight, especially when

their opinions reflect expert judgment based on continuing

observation of the patient's condition over a prolonged period of

time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)

(citations omitted); *see also Brownawell v. Commissioner of Social

Security*, 554 F.3d 352, 355 (3d Cir. 2008).

Relevant authority makes clear that a treating physician's

opinion is not always or automatically entitled to controlling

weight.  While the general principle that an ALJ need not cite

every piece of relevant evidence in the record applies in the

treating physician opinion context, the ALJ must adequtely explain

the reasons for rejecting a treating physician's opinion.

*Fargnoli*, 247 F.3d at 42; *Sykes v. Apfel*, 228 F.3d 259, 266 n.9 (3d

Cir. 2000).  In choosing to reject the treating physician's

assessment, an ALJ may not make "speculative inferences from

medical reports and may reject a treating physician's opinion

outright only on the basis of contradictory medical evidence and

> controlling weight. When we do not give the
> treating source's opinion controlling weight,
> we apply the factors listed in paragraphs
> (c)(2)(i) and (c)(2)(ii) of this section, as
> well as the factors in paragraphs (c)(3)
> through (c)(6) of this section in determining
> the weight to give the opinion. We will always
> give good reasons in our notice of
> determination or decision for the weight we
> give your treating source's opinion.

not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).

Pursuant to 20 C.F.R. § 404.1527(c)(2), an ALJ must assign controlling weight to a well-supported treating medical source opinion unless the ALJ identifies substantial inconsistent evidence. SSR 96-2p explains terms used in 20 C.F.R. § 404.1527 regarding when treating source opinions are entitled to controlling weight. 1996 WL 374188, at *1. For an opinion to be "well-supported by medically acceptable clinical and laboratory diagnostic techniques," 28 U.S.C. § 404.1527(c)(2), "it is not necessary that the opinion be fully supported by such evidence"--it is a fact-sensitive case-by-case determination. SSR 96-2p, at *2. It is a determination the adjudicator must make "and requires an understanding of the clinical signs and laboratory findings in the case record and what they signify." *Id.* Similarly, whether a medical opinion "is not inconsistent with the other substantial evidence in your case record," 28 U.S.C. § 404.1527(c)(2), is a judgment made by the adjudicator in each case. SSR 96-2p, at *3.

The ruling reinforces the need for careful review of an ALJ's decision to discount a treating source opinion, with particular attention paid to the nature of the evidence cited as contradictory. Consistent with SSR 96-2p's explanation of

regulatory terms, Third Circuit caselaw indicates that "lay reinterpretation of medical evidence does not constitute 'inconsistent . . . substantial evidence.'" *Carver v. Colvin*, Civ. A. No. 1:15-CV-00634, 2016 WL 6601665, at *16 (M.D. Pa. Sept. 14, 2016)[4] (citations omitted)).  Thus, the reviewing court should disregard medical evidence cited as contradictory if it is really lay interpretation or judgment rather than that of a qualified medical professional.  *See*, *e.g.*, *Carver*, 6601665, at *11.

Here ALJ Balutis provided the following assessment of Dr. Pathak's opinion:

> Lisa Pathak, MD, the claimant's treating physician, opined that the claimant has extreme physical limitations: she can sit or stand for no more than five minutes at one time, she can sit for no more than two hours per workday, she can stand and walk for no more than two hours per workday, she would need to rest thirty minutes to three hours multiple times per hour, she can never lift even ten pounds, and she would be absent more than three times per month.  She also opined that the claimant has significant limitations in concentration and handling stress due to pain, depression, and anxiety (Ex. 28F). These opinions receive little weight, as they are excessive on their face, and they are not consistent with Dr. Pathak's treatment records (Ex. 2F; 4F; 6F; 8F; 10F; 12F; 14F). According to Dr. Pathak's records the claimant's primary physical complaints were thoracic and right shoulder pain, which responded well to injections.  Dr. Pathak

---

[4] Magistrate Judge Gerald B. Cohn's Report and Recommendation was adopted by United States District Judge Sylvia H. Rambo on November 7, 2016.  *Carver v. Colvin*, Civ. A. No. 1:15-CV-0634, 2016 WL 6582060 (M.D. Pa. Nov. 7, 2016).

> also treated the claimant for anxiety and
> depression, but the claimant generally had a
> normal affect, good eye contact, normal
> speech, and appropriate mood and affect. (Ex.
> 11F; 12F; 14F; 21F; 23F; 25F; 26F).

(R. 27.)

The Court concludes that ALJ Balutis's evaluation of Dr. Pathak's opinion does not comport with the legal requirements set out above primarily because he does not adequately explain his determination. First, ALJ Balutis does not explain why the opinions provided "are excessive on their face." (R. 27.) Such a conclusory statement is not an *explanation* for the assessment and does not provide a basis of support for the decision to assign little weight to Dr. Pathak's opinion.

Second, ALJ Balutis's statement that the opinions "are not consistent with Dr. Pathak's treatment records" is supported only by broad citation to seven exhibits. (R. 27.) Because an ALJ's general citation to exhibits of record is not adequate evidentiary support for conclusions, *see*, *e.g.*, *Gross v. Comm'r of Soc. Sec.*, 653 F. App'x 116, 121-22 (3d Cir. 2016) (not precedential), ALJ Balutis's broad assertion does not support the conclusion that Dr. Pathak's opinion is entitled to little weight. This is particularly so in that some of the records cited predate the alleged onset date by a significant amount of time (*see*, *e.g.*, Ex. 2F [R. 263-66]) and information contained in records near and following the onset date show objective findings which arguably

34

support limitations assessed (*see*, *e.g.*, R. 332, 336, 365, 371).

Third, ALJ Balutis's general statement regarding Plaintiff's positive response to injections (R. 27) is also selective reading of the record in that the evidence review set out above shows that Plaintiff had some improvement with injections but pain remained and the effect of the injections diminished. (*See*, *e.g.*, R. 418, 425, 428.)

Fourth, the ALJ's statement about mental health findings is supported only by broad citation to seven exhibits and does not acknowledge relevant difficulties established in the record. (*See*, *e.g.*, R. 552, 565.)

Finally, ALJ Balutis cites no specific contradictory evidence. While evidence which could be characterized as contradictory may exist, the Court should not re-weigh the evidence, *Richardson v. Perales*, 402 U.S. 389, 401 (1971), or provide a basis for upholding the opinion which the ALJ himself does not, *Motor Vehicle Mfgrs. Ass'n of U.S., Inc. v. State Fweigharm Mut Auto Ins. Co.*, 463 U.S. 29, 43 (1983); *Fargnoli*, 247 F.3d at 42; *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (ed Cir. 1986). It is the ALJ's province to identify conflicting records with specificity and provide reasons for crediting certain objective clinical findings over others. *See*, *e.g.*, *Gross*, 653 F. App'x at 120-21 (citations omitted).

The Court cannot say these errors are harmless because Dr.

Pathak's opinion covers a period exceeding the Act's twelve month durational requirement. 42 U.S.C. § 423(d)(1)(A). The Court's evidence review indicates that Plaintiff routinely reported subjective severe symptoms from the alleged onset date through early 2015. (*See*, *e.g.*, R. 336, 417-18. 916-17.) During this time period, Dr. Kumar and Dr. Lilik verified symptoms on objective examination (*see*, *e.g.*, R. 426, 441, 906, 916) and Dr. Lilik cited objective diagnostic findings which Dr. Pathak referenced in her February 25, 2015, opinion (R 585). While later records do not consistently show ongoing symptom allegations but rather point to intermittent complaints and event-induced problems (*see*, *e.g.*, R. 589, 599, 708, 710, 721), over twelve months had elapsed before complaints became more sporadic. In this context it is clear that a more thorough review of Dr. Pathak's opinion and adequate explanation for the weight assigned the opinion are warranted. Therefore, this matter must be remanded for further consideration.

## B.  *Residual Functional Capacity*

Plaintiff contends that the ALJ failed to incorporate into his RFC finding all of the limitations attributable to Plaintiff's anxiety and panic disorder. (Doc. 15 at 13.) Defendant responds that the ALJ properly considered the effects of these impairments. (Doc. 16 at 15.) Because the Court concludes remand is required on the basis set out above, the issue of the effects of Plaintiff's panic attacks and anxiety disorder on her ability to maintain

gainful employment should be further explained.  This is so particularly because additional consideration of the weight assessed Dr. Pathak's opinion is required and Dr. Pathak's opinion included the conclusion that Plaintiff's mental impairments affected her physical condition and her ability to deal with work stress.  (R. 585.)

## V. Conclusion

For the reasons discussed above, Plaintiff's appeal is granted and this matter is remanded to the Acting Commissioner for further consideration.  An appropriate Order is filed simultaneously with this Memorandum.


                                    S/Richard P. Conaboy
                                    RICHARD P. CONABOY
                                    United States District Judge
DATED: June 5, 2018